UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LESTER D. WISE, | ) | Case No.: 1:09 CV 2076 |
| Plaintiff | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| WISE ENVIRONMENTAL TECHNOLOGIES, LLC, *et al.*, | ) | |
| Defendants | ) | <u>ORDER</u> |

Currently pending before the court in the above-captioned case is Defendant James Harrell's ("Harrell") Motion for Summary Judgment. (ECF No. 89.) For the following reasons, Defendant's Motion is granted. The court also orders Plaintiff to show cause within fourteen days of this Order why the court should not grant summary judgment *sua sponte* for all remaining Defendants for the same reasons summary judgment is herein granted for Defendant Harrell.

## I. FACTS

### A. Wise Environmental Technologies

In late 2008, Mr. Wise, Defendants Harrell and Robert McVicker ("McVicker"), and three other individuals agreed to form a business in order to develop and market a number of Mr. Wise's purported inventions. (Am. Compl.1, ECF No. 80.; Garcia Dep. 9, ECF No. 89.) Mr. Wise claimed to hold the patents to a device he called the "Laddermaxx," which was a basket that attached to a ladder. (Am. Compl.4; Garcia Dep. 9.) Mr. Wise also claimed to have more than 10,000 saleable Laddermaxx units stored in a warehouse in Ohio. (Compl. 5, ECF No. 1.; Garcia Dep. 48) Mr. Wise's talents appeared to extend beyond basket design, however, as he told the Defendants that he had developed two devices that could power traditional furnaces and internal combustion engines with water instead of gasoline or other traditional fuels. (Marston Dep. 7-8, 18, ECF No. 89; Garcia

Dep. 9.) Further, Mr. Wise represented that he had invented a coil that could generate massive amounts of electricity from a 9-volt battery. (Marston Dep. 18.) Mr. Wise dubbed these three devices "WET units" or "WET technology."

The parties agreed to form a limited liability company, Wise Environmental Technologies, that would market the Laddermaxx and support development of the WET technology. (Am. Compl. 3.) Mr. Wise agreed to transfer all rights to the four products to Wise Environmental Technologies in exchange for a thirty percent interest in the company. The parties retained Michael Marston, a patent lawyer, to determine whether the WET units could be patented. (Marston Dep. 41.) On January 27, 2009, the parties met with Mr. Marston. Mr. Wise described the WET units and provided Mr. Marston with what Mr. Wise claimed to be the design for one of the water-power units. (*Id.* at 7.) On February 9, the parties commissioned Mr. Marston to conduct a patent search to see if Mr. Wise's design was novel enough to merit a patent. (*Id.* at 8.)

The parties did not wait for the patent search to conclude before moving forward with the venture. The Defendants contacted retailers and attended a trade show in their efforts to generate Laddermaxx sales. (Garcia Dep. 30-31.) Wise Environmental Technologies, LLC, was registered in Nevada on February 19, 2009, with the individual Defendants and the three other individuals listed as managing members. The Defendants created an operating agreement and business plan, and began to research potential trademarks for the WET units. (*Id.*) At his deposition, Scott Garcia ("Mr. Garcia"), a member and authorized manager of Wise Environmental Technologies, testified that "Les asked us all personally for money every chance he got." (*Id*. at 32.) At one point, for example, Mr. Wise requested $45,000 to develop a circuit board that Mr. Garcia determined could be produced for "significantly less than $100." (*Id*. at 39-40.) At another point, Mr. Wise "indicated that he needed to have a minimum of $4,000 wired to his account . . . to pay various personal and

business expenses." (Pl.'s Ex. G., Attach. to Garcia Dep.) Mr. Garcia sent at least $10,000 to Mr. Wise in part to defray the cost of storing the Laddermaxx units. (Bank Statement, Attach. to Garcia Dep.) Defendant McVicker also alleges that he sent Mr. Wise money during this period. (Def. McVicker's Rebuttal, ECF No. 81.)

Mr. Marston completed his patent search in early March of 2009. His conclusion: Mr. Wise's water-power unit was not patentable. Mr. Marston discovered that "every element of Mr. Wise's invention" had been copied from a publically available manual for a product, called the "Hydrostar," created by someone other than Mr. Wise. (Marston Dep. 16.) Mr. Wise had attempted to pass off the Hydrostar as his own invention. Mr. Marsten reported his findings in a letter to Defendant McVicker dated March 3, 2009. (*Id.* at 17.)

Mr. McVicker eventually shared Mr. Marston's findings with the other Defendants, but not before Wise Environmental Technologies formally acquired the rights to Mr. Wise's products and inventory. On March 11, 2009, Mr. Wise signed three documents, the Operating Agreement mentioned above (ECF No. 80-4), an Agreement to Exchange Assets for Member Units ("Agreement") (ECF No. 80-1), and a Patent and Trademark Assignment ("Assignment") (ECF No. 80-3). In its preamble, the Agreement states that Mr. Wise and Wise Safety Solutions, LLC (of which Mr. Wise was manager and sole member) "have patents and/or Trademarks on products collectively known as the 'LADDERMAXX' . . . and . . . have invented [the WET units]." (Agreement, at 1). In the first substantive clause of the Agreement, Mr. Wise and his company "agree to . . . convey all rights title and interest in all LADDERMAXX patents and all trademarks, if any, all units of inventory on hand . . . free and clear of any encumbrance . . . ." In the second clause, Mr. Wise and his company agree to "convey all rights title and interest in the WET units technology." The third and final clause reads as follows:

> Parties of the First Part [i.e., Mr. Wise and Wise Safety Solutions] warrant that they have good and marketable title, free of all liens and encumbrances, to the LADDERMAXX patents, any Trademarks, and inventory, and Party of the First Part Lester D. Wise warrants that he is the inventor of the WET unit technology and that he has good and merchantable title, free of all liens and encumbrances, to such technology; . . . .

(*Id.*) In exchange for the patents, inventory, and rights to the WET technology, Wise Environmental Technologies agreed to give Mr. Wise 15,000,000 member units (7,500,000 for the rights to the Laddermaxx and 7,500,000 for the rights to the WET units) – a 30 percent ownership stake in the company.

The Assignment states, in relevant part, that Mr. Wise "is the sole owner of the listed patent applications set forth in Attachment A attached hereto and to the inventions described therein . . . ." Attachment A listed three "patent serial number[s]" for the Laddermaxx along with the invention name ("Basket Caddy for a Step Ladder"), inventor ("Lester D. Wise") and filing dates. (Def.'s Ex. 4., Marston Dep.) Mr. Garcia, acting as an agent of Wise Environmental Technologies, signed both documents on March 13, 2009. Two of the patent numbers referred to applications filed with the U.S. Patent Office; the third ostensibly referred to an international application filed pursuant to a patent cooperation treaty.

The Operating Agreement contains an addendum entitled, "Ownership Structure" that listed each member's "percent ownership" in the company. In relevant part, the addendum states:

> Note 1: Les [i.e., Mr. Wise] receives 15% for the transfer of Ladder Max [sic] patents, inventory[,] etc.[,] to Wise Environmental Technologies. He also receives another 15% for transferring his rights to his invention of the three WET units . . . .

(Operating Agreement 28.) The addendum was signed by Mr. Wise. The copy of the addendum in the record does not contain any other signatures, but Mr. Garcia testified that a fully-executed copy existed. (Garcia Dep. 51; *see also* Pl.'s Aff., 68-1.)

- 4 -

Soon after Wise Environmental Technologies signed the Agreement and the Assignment, the company attempted to take possession of the Laddermax inventory. The units were stored at a warehouse in Wooster, Ohio, owned by D+S Distribution, Inc., pursuant to a contract with Wise Safety Solutions. On March 27, 2009, D+S notified Mr. Garcia that it had placed a $1,513.36 lien on the Laddermaxx units because Mr. Wise had not paid the storage fees for the last three months. (Letter from D+S Distribution, Inc., Def.'s Attach. 1 at 5-7, ECF No. 89-1.) Until Mr. Wise paid off the lien, D+S was "not in a position to assign the [storage lease] to Wise Technologies, LLC, Scott Garcia[,] or any 3rd Party at this time." (*Id.*)

During this same period, Defendant McVicker asked Mr. Marston to ascertain the status of the Laddermaxx patents. Mr. Marston discovered that both of Mr. Wise's Laddermaxx applications to the U.S. Patent office had been rejected. One application had been abandoned for failing to reply to an action by the Patent Office rejecting the patent because it was identical to the other application. (Marston Dep. 19-35.) The second application had been rejected on the grounds of "obviousness-type double patenting," because Mr. Wise had copied patented designs. (*Id*. at 47-51.) Mr. Marston also discovered that, while the international application had been made, there were no national patent applications connected to the international filing. In other words, Mr. Wise's international filing was based on a nonexistent U.S. patent application. Both patents had been rejected (and Mr. Wise had been notified as such) in 2008. Mr. Wise had not appealed either rejection, and both applications were deemed to be abandoned; the Patent Office notified Mr. Wise of the abandonments on February 11, 2009, and July 31, 2009. (*Id.*)

March of 2009 proved to be a critical month for Wise Environmental Solutions. The company learned that it possessed nothing – the WET technology was unpatentable, the Laddermaxx patents had been rejected and abandoned, and title to the Laddermaxx units was clouded by an

inventory lien. The parties' business venture had come to an end. Mr. Wise was never officially made an officer of Wise Environmental Solutions. The company was officially dissolved in February of 2010. Aside from the instant suit, it appears that the company had long since ceased to operate.

### B. Midwest Energy Ventures

On February 5, 2009, Mr. Wise offered to buy 10,000 shares of Midwest Energy Ventures, LC. Defendant McVicker served as the company's Vice President and appears to have been authorized to sell its shares. (Subscription Agreement 5, ECF No. 80-2.) Mr. Wise signed a Subscription Agreement which by its terms constituted an offer to buy 10,000 LC shares at an unspecified price per share. (*Id.* at 1.) Mr. Wise represented that he was an "accredited investor" as defined by the SEC's Regulation D because his individual income had exceeded $200,000 per year for the past two years or his joint income exceeded $300,000 per year for the past two years. (*Id.*) Defendant McVicker, acting as an officer of the company, also signed the agreement, indicating that Mr. Wise's offer had been accepted. (*Id.* at 5.)

Aside from a copy of the agreement, the record contains very little about this deal. Defendant McVicker alleges that Mr. Wise never tendered payment to Midwest Energy Ventures. (McVicker Aff. ¶¶ 11-12, Def.'s Ex. 2, ECF No. 89-2.) Mr. Wise has not alleged that he paid the company, nor has he provided any evidence of payment. Midwest Energy Ventures is not a party to this suit.

### II. PROCEDURAL HISTORY

Mr. Wise filed suit against Wise Environmental Technologies, James Harrell, Robert McVicker, Scott Garcia, David Schuler, and Daniel Tomaszewski on September 8, 2009, alleging both racketeering and breach of contract. On September 20, 2010, Mr. Wise notified the court that he had petitioned for bankruptcy and requested a stay. On January 27, 2012, Mr. Wise, who had

- 6 -

been discharged from bankruptcy, petitioned to reopen the case; the case was reopened on February 14, 2012. On March 20, 2012, Mr. Wise filed an Amended Complaint, naming five of the original six Defendants (Mr. Tomaszewski was not named) and alleging only breach of contract. Defendant McVicker filed a "Rebuttal"– which the court construes as an Answer – in the form of a letter addressed to the court on April 4, 2012. Also on May 18, 2012, Defendant Harrell filed an Answer to Plaintiff's Amended Complaint, denying the allegations and stating both fraud and "lack of consideration" as affirmative defenses. On June 6, 2012, this court granted Plaintiff's motion to dismiss Mr. Garcia and Mr. Schuler without prejudice. On June 8, 2012, Mr. Wise filed a Motion to Dismiss the Amended Counterclaim. Defendant Harrell moved for Summary Judgment on September 13, 2012.

Defendants have at all times appeared *pro se*.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and provides that:

> A party may move for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

A party asserting there is no genuine dispute as to any material fact or that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine dispute as to any material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual dispute is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most cases the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999). The moving party has the burden of production to make a prima facie showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).

If the burden of persuasion at trial would be on the non-moving party, then the moving party can meet its burden of production by either: (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim"; or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* However, "where the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). Thus, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the

evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

If the moving party meets its burden of production, then the non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Id.* The United States Supreme Court has explained that, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted); *see also Celotex*, 477 U.S. at 322–23. Moreover, the court does not have a duty "to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

## IV. LAW AND ANALYSIS

As it now stands, Mr. Wise alleges three distinct contractual breaches. Mr. Wise alleges that the Defendants breached: (1) the Agreement to Exchange Assets because they did not transfer 7,500,000 member units to Mr. Wise; (2) the Operating Agreement because they did not grant him a 30% ownership interest in Wise Environmental Technologies; and (3) the Midwest Energy Ventures subscription agreement because they did not tender the requested 10,000 shares. In his Amended Complaint, Mr. Wise states that he "had" patent rights to the Laddermaxx (Am Compl. ¶13), and that the Defendant's "failed to pay the necessary fees to the United States Patent Office, causing the Patent rights . . . to be in jeopardy." (*Id.* at ¶17.) Otherwise, the Amended Complaint

is quite cryptic. Mr. Wise does not directly assert that he owned anything besides the patent and trademark rights to the Laddermaxx. He does not allege that he paid for the Midwest Energy Ventures shares, nor does he make any direct reference to the WET units. Mr. Wise alleges damages in excess of $7,500,000, the alleged par value of the member shares he claims are due to him.

In his Motion for Summary Judgment, Defendant Harrell argues that he is entitled to summary judgment because Mr. Wise "breached the contract[s]" at issue by "fail[ing] to provide the consideration specified" therein. (Mot. 9.) Harrell points to the warranties in the Asset Agreement and the Midwest Energy Ventures Subscription Agreement; his argument is that because Mr. Wise did not own a patent for the Laddermaxx, the Laddermaxx inventory had been encumbered by an inventory lien, and the WET units were not in fact Mr. Wise's inventions, Mr. Wise breached both the Asset Agreement and Ownership Structure. Defendant Harrell also argues that Mr. Wise breachd the Midwest Energy Ventures Subscription Agreement because he was not an "accredited investor" and, furthermore, never paid for the 10,000 shares he had agreed to purchase.

In response, Mr. Wise argues that Defendant Harrell has raised factual rather than legal issues, and that consequently such disputes regarding material facts render summary judgment inappropriate. Mr. Wise also argues that the outcome of Defendant Harrell's motion should only affect Defendant Harrell because the other Defendants have not filed for summary judgment.

This case is relatively straightforward. Mr. Wise told the Defendants that he possessed intellectual property in the form of the Laddermaxx patents and the WET technology. In fact, he did not have any such property. The Laddermaxx patents had been rejected and abandoned, and the WET technology was unpatentable. Mr. Wise also represented to the Defendants that he owned a number of Laddermaxx units. In fact, Mr. Wise's title was clouded by a lien incurred because he had neglected to pay the storage fees for the Laddermaxx units. Mr. Wise signed two contracts in which

he sold the Defendants his nonexistent intellectual property rights and his encumbered chattel property rights. In those contracts, Mr. Wise affirmatively warranted that he possessed such rights – he claimed that the nonexistent intellectual property did in fact exist and that the encumbered title to the Laddermaxx units was in fact unencumbered. In return, Mr. Wise was to receive an ownership share in a business created to market and develop his nonexistent property.

### A. Wise Environmental Technologies: Failure of Consideration

A standard commercial contract cannot be formed without some kind of consideration. *Ratchford v. Proprietors' Ins. Co.*, 546 N.E.2d 1299 (Ohio 1989); *Carlsile v. T&R Excavating, Inc.*, 704 N.E.2d 39, 43 (6th Dist. Ohio Ct. App. 1984) ("Without consideration, there can be no contract."), *Helle v. Landmark, Inc.*, 472 N.E.2d 765, 765 (6th Dist. Ohio Ct. App. 1984). Consideration may consist of either a detriment to the promisee or a benefit to the promisor. *Williams v. Ormsby*, 966 N.E.2d 255, 259 (Ohio 2012). As the Supreme Court of Ohio has explained, "[a] benefit may consist of some right, interest, or profit accruing to the promisor, while a detriment may consist of some forbearance, loss, or responsibility given, suffered, or undertaken by the promisee." *Id.* Although Ohio courts "may not inquire into the adequacy of consideration," a court can resolve "whether there is consideration at all . . . ." *Id.* A court presumes the existence and validity of apparently valid consideration recited in a contract, but that presumption may be rebutted by parol evidence. *City of Lima v. Pub. Utils. Comm'n*, 126 N.E. 318, 420 (Ohio 1919). Furthermore, since consideration is "the bargained for legal benefit and/or detriment," *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002), "[c]onsideration for a contract can only be that which the parties intended to be the consideration." *Busch Bros. Elevator Co., Inc. v. Unit Bldg. Servs.*, 942 N.E.2d 404, 406 (1st Dist. Ohio Ct. App. 2010) (quoting *Borgerding v. Ginocchio*, 43 N.E.2d 308,

310 (1st Dist. Ohio Ct. App. 1942)). Generally, a standard commercial contract is void without consideration.

Ohio law distinguishes between want or lack of consideration and failure of consideration. A contract may be void for want or lack of consideration if, as the term suggests, there was no consideration at all. In contrast, a contractual obligation may be avoided for failure of consideration if a party does not deliver the bargained-for consideration. *See, e.g.*, *Darst v. Brockway*, 11 Ohio 462 (1842) (voided patents constituted failed consideration). In the case at hand, failure of consideration is the more appropriate legal framework. Mr. Wise agreed to exchange "all rights title and interest in all Laddermaxx patents," "all units of inventory on hand of the Laddermaxx," and "all rights title and interest in the WET units technology" for 15 million member units of Wise Environmental Technologies. (Agreement 1-2.) He explicitly warranted that he had "good and merchantable title, free of all liens and encumbrances, to the Laddermaxx patents . . . and inventory. . . ." (*Id.* at 2.) He also warranted that "he is the inventor of the WET unit technology and that he has had good and merchantable title, free of all liens and encumbrances, to such technology." (*Id.*) But the consideration promised by Mr. Wise entirely failed: title to the inventory was encumbered, title to "the Laddermaxx patents" was by no means "good and merchantable," and Mr. Wise had plagiarized the "WET units technology." Mr. Wise did not and could not perform his contractual obligation. The bargained-for consideration having failed, Wise Environmental Technologies was under no obligation to tender any member units or otherwise grant Mr. Wise an ownership interest in the company. As Defendant Harrell's Motion for Summary Judgment puts it, "Plaintiff failed to provide the consideration specified in the Asset Agreement to Defendants, and therefore breached the contract . . . ." (Mot. 9.)

In his reply brief, Mr. Wise makes two arguments; neither are well-taken. First, he claims that "the performance of the contract by the Plaintiff does not depend on the transfer of the LADDERMAXX patent rights" because the contract expressly provides for the possibility that such rights might not have existed. He points to the following clauses: "Parties of the First Part agree to bargain, sell, transfer and convey all rights title and interest in all LADDERMAXX patents and all trademarks, *if any*. . . ." Mr. Wise argues that "if any" could apply to both "patents" and "all trademarks," and that this supposed ambiguity creates a genuine and material factual dispute. Mr. Wise is wrong. First, the contract is not ambiguous. If the two clauses were read in isolation, "if any" might modify only "all trademarks." But, in the context of the entire Agreement, the meaning of the clauses is manifestly clear. The same sentence later refers to "*the* patents" rather than "*any* patents." Paragraph 3 of the Agreement refers to "*the* LADDERMAXX patents, *any* Trademarks, and inventory." The Assignment also uses definite language when addressing the Laddermaxx patents, referring "*the* patents," "*the* listed patent applications," and "*all* Patents." In contrast, the Assignment mentions "Trademarks, *if any*," and states that "Assignor *may have* Trademarks . . . ." There is no ambiguity here: the contract clearly hinges on the existence of actual patents.

More importantly, summary judgment would be warranted even if the existence of the patents were not a necessary element of the contract. Defendant Harrell argues that "[t]he Inventory Plaintiff sought to transfer to Wise Environmental Technologies, LLC was not free and clear of all encumbrances . . . ." (Mot. 10.) Mr. Wise does not contest the point. There is no question that there was a lien on the Laddermaxx units. Mr. Wise explicitly warranted that he had "good and merchantable title, free of all liens and encumbrances, to the LADDERMAXX . . . inventory." Mr. Wise violated that warranty and breached the Agreement. Unencumbered title to the Laddermaxx inventory was clearly material consideration, which is to say that it was an important part of the

bargained-for exchange. The encumbrance alone deprives Mr. Wise of the 7,500,000 member units offered in exchange for "all rights title and interest in" the Laddermaxx, including "all units of inventory on hand . . . free and clear of any encumbrance."

Mr. Wise's Opposition makes no mention of the Ownership Structure addendum to the Operating Agreement. In his Amended Complaint, he alleged that the addendum entitled him to a 30% share in Wise Environmental Technologies. To be entitled to all of that 30% share, however, Mr. Wise would have to show that he had invented the WET technology. Mr. Wise appears to have abandoned that claim.

Mr. Wise also asserts that he genuinely believed that he possessed patent rights to the Laddermaxx. In his Reply, he states that "Plaintiff's lack of familiarity with the patent process accounts for his lack of knowledge as to any rejection or abandonment of his patents." In support, he submits an affidavit stating that "[a]t the time that I signed the Agreement . . ., it was my belief that I possessed the right to patent the LADDERMAXX product." (Def.'s Aff. ¶ 5, ECF No. 90-2.) The court need not address this assertion since it is irrelevant to the question of failure of consideration.  Defendant Harrell did raise fraud as an affirmative defense, but has moved for summary judgment on the basis of his alternative defense – lack of consideration.

### B. Midwest Energy Ventures

Defendant Harrell moves for summary judgment on Plaintiff's breach of contract claim regarding Midwest Energy Ventures. Plaintiff's Brief in Opposition does not address this claim. Defendant Harrell argues that Mr. Wise breach of contract claim fails because Mr. Wise did not perform his contractual obligation to pay for the shares he agreed to purchase.  In his affidavit, Defendant McVicker states that "Plaintiff never paid for the subscribed units in Midwest Energy

Ventures, LC, and therefor was not entitled to receive any units." (McVicker Aff. ¶ 12.) Plaintiff does not contest this statement.

The court grants summary judgment for Defendant Harrell. It is axiomatic that performance by the plaintiff is an essential element of a breach of contract claim. *See, e.g.*, *Doner v. Snapp*, 649 N.E.2d 42, 44 (2d Dist. Ohio Ct. App. 1994). Supported by Mr. McVicker's affidavit, Defendant Harrell has asserted that Plaintiff never paid for the LC shares he had contracted to buy. Plaintiff has not rebutted–nor even addressed–this evidence of nonperformance. There is therefore no dispute that Plaintiff did not perform his contractual obligation under the Midwest Energy Ventures Subscription Agreement. Plaintiff's nonperformance defeats his breach of contract claim and Defendant Harrell is therefore entitled to summary judgment as a matter of law.

### C. Summary Judgment for Nonmoving Defendants

Defendant Harrell moves for summary judgment "in favor of all Defendants." (Def.'s Mot. at 1.) Plaintiff points out that only Defendant Harrell has filed for summary judgment, and that Harrell does not have the authority, as a *pro se* litigant, to represent any other Defendants. Accordingly, Plaintiff argues that this court may only grant summary judgment for Defendant Harrell. Plaintiff is correct.

However, the court may and does order Plaintiff to show cause within fourteen days of this Order why this court should not grant summary judgment *sua sponte* for all Defendants on Plaintiff's claims arising from the contracts regarding the Laddermaxx patents, Ladderaxx inventory, and WET Technology for the same reasons summary judgment is granted herein for Mr. Harrell. In the same brief, Plaintiff should show cause why, in light of Defendant McVicker's uncontested affidavit, the court should not grant summary judgment *sua sponte* for all Defendants, including Defendant McVicker, on Plaintiff's claims arising from the Midwest Energy Ventures

contract should Plaintiff oppose the granting of summary judgment. Plaintiff should include any additional legal arguments that he may have regarding the underlying merits of his claims in his response to this Order to Show Cause.

## V. CONCLUSION

The court grants summary judgment for Defendant Harrell on all claims raised in his Motion. (ECF No. 89.) The court also orders Plaintiff to show cause within fourteen days of this Order why the court should not grant summary judgment *sua sponte* for all other Defendants on Plaintiff's: (1) breach of contract claims arising from the Agreement to Exchange Assets, Operating Agreement, and Assignment; and (2) Plaintiff's claims arising from the Midwest Energy Ventures Subscription Agreement. The court will hold a telephonic status conference with the parties and/or their counsels regarding all remaining claims, including those asserted by the Defendants against Plaintiff, on March 29, 2013, at 10:00 a.m.

IT IS SO ORDERED.

/s/ *SOLOMON OLIVER, JR.*
CHIEF JUDGE
UNITED STATES DISTRICT COURT

March 15, 2013